## HILL–CREEK ACRES ASSOCIATION, INC., Respondent,

v.

## Jerry D. TOMERLIN, et al., Appellants.

### No. WD 60726.

Missouri Court of Appeals, Western District.

March 18, 2003.

Thomas M. Schneider, Columbia, MO, for appellants.

Victor S. Scott, Lanette R. Gooch, Diedre D. Jewel, Jefferson City, MO, for respondent.

Before BRECKENRIDGE, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

Appellants purported to create an emergency roadway easement across a lot in Respondent's subdivision to allow for Appellants' use of Respondent subdivision's

private roads when Appellants' sole way of ingress and egress to their properties in their abutting subdivision floods or is otherwise impassable. Respondent filed suit, seeking to declare the attempts to create the easement null and void and seeking an injunction from Appellants' further attempts to so use the lot.

The trial court declared Appellants' two attempts to create the emergency roadway easement null and void and issued an injunction enjoining the owners of the lot in question from ever granting such an easement and also preventing the abutting subdivision's property owners (certain of the Appellants) from using the private roads in Respondent's subdivision. Appellants challenge the trial court's basis for such judgment, bringing nine points of error on appeal.

As explained below, the trial court did not err in declaring Appellants' two attempts to create an emergency roadway easement null and void and issuing a permanent injunction. Therefore, we affirm the trial court's judgment.

## Background

This case arose after Appellants twice attempted to create an emergency roadway easement across a lot in Respondent's subdivision to allow for their access to Respondent's private roads from Appellants' abutting subdivision. Because of the various parties involved and the timing of when the attempts to create the easements occurred, the following succinct description of the parties involved and a timeline of events is helpful to understanding the background of this case:

1. It is not clear from the record when the Bonne Femme Estates subdivision was developed, but it appears that it was around the time that the attempts were made to create

## Parties

**Respondent:** Hill–Creek Acres Association, Inc., the Plaintiff at the trial court level and Respondent herein, is the homeowners' association for Hill–Creek Acres subdivision in Columbia, Missouri, where the lot in controversy is located. It owns, operates, and maintains the subdivision's private roads for the benefits of the homeowners.

**Appellants:** Appellants, who were the defendants below, can be separated into three groups based on their interests in this litigation. The first group consists of Thomas Mendenhall, John McGee, Gary Evans, and Meir Lazar as general partners of the Bonne Femme Partnership, which developed the Bonne Femme Estates (the subdivision abutting Respondent's Hill–Creek Acres subdivision)[1] and which owns six of the subject lots in Bonne Femme Estates. The second group is Thomas and Diane Mendenhall, who, as husband and wife, own Lot 32A, the other subject lot in Bonne Femme Estates. The third group is Jerry and Karon Tomerlin, who, as husband and wife, are the current owners of Lot 25 in Hill–Creek Acres—the lot upon which they sought to create an easement to allow the Bonne Femme Estates lot owners to gain access to Respondent's roads when the road to Bonne Femme Estates flooded. As explained below in the timeline, the Tomerlins purchased Lot 25 from Thomas and Diane Mendenhall, John and Cynthia McGee, and Gary and Virginia Evans ("the Mendenhalls, McGees, and Evanses"). Mr. Tomerlin is an employee of Mr. Mendenhall.

## Timeline:

June 30, 1967: Merle and Frances Smarr execute a document entitled "Protec-

the easements after the partnership discovered the only entrance to Bonne Femme floods on occasion.

tive Covenants," which establishes and implements certain restrictive covenants for the benefit of Hill–Creek Subdivision. The Protective Covenants were recorded in Boone County, Missouri, on July 3, 1967.

July 29, 1971: Respondent, Hill–Creek Acres Association, Inc., becomes incorporated for the benefit of the record homeowners in Hill–Creek Acres Subdivision. The Smarrs transferred ownership of the roads in Hill–Creek Acres to the Association. Homeowners pay an annual road license and use fees of $100 for maintenance of Hill–Creek Acres' private roads.

May 29, 1975: Respondent grants and records an "easement . . . to run with the land" to all present and future lot owners in Hill–Creek Acres for ingress and egress over all of the Hill–Creek Acres subdivision's private roads owned by Respondent.

May 28, 1998: The Mendenhalls, McGees and Evanses execute a "Roadway Easement for Emergency Use" ("ER EASEMENT 1") across Lot 25 of the Hill–Creek Acres subdivision in favor of themselves, the partners in the Bonne Femme Partnership and owners of other lots located in the Bonne Femme Estates subdivision. None of the grantors have an ownership interest in Lot 25 at this time. It was owned by Susan Langhorst.

June 30, 1998: Susan Langhorst executes a General Warranty Deed, transferring Lot 25 to the Mendenhalls, McGees, and Evanses, who executed ER EASEMENT 1 on May 28, 1998. They record the deed 38 seconds before they record ER EASEMENT 1 with the Boone County, Missouri, Recorder of Deeds.

July 8, 1998: Thomas Mendenhall meets with Respondent to propose his plan to construct a roadway across Lot 25 in Hill–Creek Acres to connect the Bonne Femme Estates lots with Hill–Creek Acres for emergency access to use Respondent's roads during the occasions in which the only access road from a public road to Bonne Femme Estates floods. He reasons that to "raise" the low water crossing would require installing an $80,000 box culvert and it would cost $200,000 to install a new bridge over the low water crossing.

That same day, Respondent unanimously votes to reject the proposal.

July 12, 1998: In accordance with amendment procedures set forth in the "Protective Covenants" recorded for the benefit of Hill–Creek Acres on June 30, 1967, sixty percent of Hill–Creek Acres homeowners execute an amendment to the covenants. The amendment provides:

—No homeowner shall: construct or permit the construction of a road, drive or way to any adjacent tract of land; permit an owner of any adjacent tract of land to use any portion of Hill–Creek Subdivision for ingress and egress; or grant or have the power to grant any person, firm or organization the right to use the private roads owned by Respondent.

—No road, drive, or way shall be constructed or permitted upon any tract of land within Hill–Creek Subdivision which shall connect with, lead from, or to, or join, or permit connection with, or permit the joining of any Hill–Creek Subdivision private road to any adjacent tract of real estate.

—No homeowner shall permit an adjacent landowner use of any portion of Hill–Creek Subdivision for the purpose of access to or egress to the

private roads of Respondent from any adjacent tract of land; and

—No Hill–Creek Subdivision homeowner or possessor of any tract of land shall grant to any person or firm or organization any right to use the private roads located in Hill–Creek Subdivision, which are owned by Respondent.

July 27, 1998: Respondent notifies Mr. Mendenhall by letter of its unanimous rejection of his July 8, 1998, proposal for the roadway across Lot 25.

August 27, 1998: The Mendenhalls, McGees and Evanses execute a General Warranty Deed conveying Lot 25 to Jerry and Karon Tomerlin.

September & October of 1998: Thomas Mendenhall and Jerry Tomerlin began to clear a portion of Lot 25 to construct an unpaved emergency road for access from the lot to the seven tracts in the Bonne Femme Estates during emergency conditions only.

October 21, 1998: Appellants Tomerlin execute a second "Roadway Easement for Emergency Use" ("ER EASEMENT 2") across Lot 25, which is identical to ER EASEMENT 1, executed by the Mendenhalls, McGees and Evanses on May 28, 1998, with the exception of the named grantors.

May 28, 1999: Respondent files suit, seeking a declaratory judgment and injunction preventing Appellants' intended use of Lot 25.

March 26, 2001: Respondent moves for summary judgment with suggestions in support.

May 10, 2001: Appellants respond with suggestions in opposition.

October 10, 2001: The parties agree to submit the case for final determination on the basis of Respondent's summary judgment motion, Appellants' response, and all documents filed in connection therewith rather than proceed to trial.

November 14, 2001: The trial court issues its findings of fact, conclusions of law and judgment in Respondent's favor, i.e., declaring the attempted easements null and void and issuing a permanent injunction, and assesses costs against Appellants.

November 28, 2001: Appellants file their notice of appeal.

## Standard of Review

The trial court granted summary judgment to Respondent, finding, as a matter of law, that Appellants' two attempts to create the emergency roadway easement across Lot 25 were null and void and that Respondent is entitled to a permanent injunction. Summary judgment is appropriate when the movant shows that there is no genuine dispute of material fact, and, thus, he, she, or, in the case of Respondent corporation, it is entitled to judgment as a matter of law. Rule 74.04(c)(3);[2] *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). As explained by the Missouri Supreme Court:

[Appellate] review is essentially *de novo.* The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on

**2.** Missouri Rule of Civil Procedure (2002). This rule governing summary judgment has been amended effective January 1, 2003.

the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

*Id.* at 376 (citations omitted). Although "[f]acts set forth by affidavit or otherwise in support of [Respondent's] motion are taken as true unless contradicted by [Appellants'] response to the summary judgment motion," we review the record and all reasonable inferences therefrom in a light most favorable to Appellants, the non-moving parties. *Id.*

Appellants bring nine points on appeal challenging the trial court's findings that both ER EASEMENT 1 and ER EASEMENT 2 are null and void. In considering each of their points, it becomes evident that the primary issue is whether the easements Appellants attempted to create were valid under Missouri law. If neither easement is legally valid, then many of Appellants' arguments become moot. Consequently, rather than considering Appellants' points in turn, we discuss the validity of ER EASEMENT 1 and ER EASEMENT 2 below. In so doing, we incorporate Appellants' applicable arguments.

### Validity of the Emergency Roadway Easement

As explained above in our timeline, on May 28, 1998, the Mendenhalls, McGees, and Evanses executed ER EASEMENT 1 across Lot 25 of the Hill–Creek Acres subdivision. The document indicates that the easement was "made and entered into ... between [the Mendenhalls, McGees, and Evanses] and Bonne Femme Partnership." It states that the Mendenhalls, McGees, and Evanses own Lot 25, the servient tenement, and they:

> grant to Bonne Femme [Partnership] and [the] Mendenhall[s] a [twenty-five foot wide] perpetual, nonexclusive road-

way easement over and across a [particularly described] portion of ... Lot 25 and Lot 32–C for the use and benefit of the present and future owners of [the 7 particularly described Lots and Tracts in the Bonne Femme Estates subdivision] for ingress to and egress from said Lots and Tracts during periods of emergency....

The parties agreed that these "periods of emergency" when the easement would be used were:

> only when roadway ingress to and egress from said Lots and Tracts [in Bonne Femme Estates] over and across the roadway area leading north from said Tracts known as Quantrill's Pass is temporarily precluded by the flood waters of Bonne Femme Creek, by snow or ice or by other temporary emergency circumstances. The easement area shall not be used for ingress and egress to said Lots and Tracts except under the aforesaid circumstances. The easement area, notwithstanding the foregoing, shall never be used by construction equipment, construction vehicles, dump trucks or other heavy vehicles except in connection with the repair and maintenance of the same.

They further agreed that the roadway easement:

> Shall not be used for parking of vehicles or storage of any materials and shall not be blocked nor obstructed, and that no fence, gate or other obstruction shall be installed in the easement area, except the owners of [the benefited Bonne Femme Estate lots and tracts] may by a majority rule install and maintain a gate across the easement area at the east boundary line of Lot 32–C through which all of the owners and occupants of said Lots and Tracts shall have right of access during the aforesaid temporary emergency circumstances.

ER EASEMENT 2 was executed on October 21,1998, by the Tomerlins. It is identical to ER EASEMENT 1 except for the grantors.

In the trial court, Respondent advanced a number of arguments against the validity of the easements. We will focus on one such argument which is dispositive of the case: that Appellants had no legal authority to interfere with and additionally burden Hill–Creek's homeowners' exclusive road use easement thereby altering the nature and character of that easement.

■ Once the character and extent of an easement has been fixed and determined, a subsequent easement materially altering the character of the original easement is impermissible. *Cheatham v. Melton,* 593 S.W.2d 900, 904 (Mo.App. E.D. 1980). In *Cheatham,* two brothers established and shared a common private driveway between their two parcels of land that allowed entry to their two parcels from the south. They utilized the drive for personal access to their residences and to permit access by business invitees, delivery personnel, and private visitors. Years later, one brother acquired additional land north of the brothers' property and then constructed a road extending from the north boundary of his parcel and merging with the brothers' common driveway. He then granted an easement in favor of certain lot owners in the nearby Tangee Terrace subdivision, allowing them to use the new road to drive across his property and gain access to the common driveway. In effect his doing so "open[ed] up the joint driveway to through public traffic." *Id.* at 902. The appellate court found that because "strangers to the residents would be traversing the driveway as through traffic," the original extent and character of the private common driveway easement was

materially altered. *Id.* at 904. Thus, it affirmed an injunction prohibiting this use of the driveway.[3]

In our case, the trial court found that purported easement granted to Appellants was inconsistent with the previous road easement and rights granted to Hill–Creek homeowners. As explained below, we agree.

A reading of the Hill–Creek road easement in conjunction with the Protective Covenants and Bylaws for the subdivision indicates the nature and extent of the homeowners' preexisting rights. The roads in the Hill–Creek subdivision are private and are owned by Respondent, Hill–Creek's homeowners' association. In 1975, Respondent granted all present and future subdivision lot owners an easement for ingress and egress on all neighborhood roads. Pursuant to Respondent's Bylaws, the homeowners pay $100 per year for use of these private roads. Respondent's roads are clearly for the personal use of the homeowners. Allowing residents of a neighboring subdivision to drive across one of Hill–Creek's lots to utilize private roads as a throughway is inconsistent with this use.

Appellants focus heavily on their claim that any increased burden on Hill–Creek's roads would be minimal because they project the emergency easement will result in an average increase of one vehicular round trip every five days. They then point to case law for the proposition that no unlawful burden is placed on a servient estate by increasing the volume of traffic on an unlimited easement. *Karches v. Adolph Inv. Corp.,* 429 S.W.2d 788, 793 (Mo.App.1968). However, that rule of law was applied to a much different situation than exists in our case.

3. The injunction was affirmed with remand for modification not relevant to this opinion.

In *Karches*, the defendant owned a 34–acre tract of land. *Id.* at 789. There were two residences on his tract which gained ingress and egress via a preexisting easement over Lake Sherwood's (a neighboring subdivision) roadways. Defendant decided to subdivide his tract into 42 lots and planned to utilize the same easement for the use of all the lots. Lake Sherwood, as holder of the servient tenement, objected and claimed that defendant was limited to an easement for the original two residences. *Id.* at 790. On appeal, the court noted that, *unless forbidden*, the possible subdivision of a dominant tenement is so common so as to be assumed and contemplated in the creation of the original easement. *Id.* at 792 (emphasis added). Accordingly,

> "[t]he burden upon a servient tenement frequently will not be greatly increased by permitting an easement appurtenant to attach to each of the parts into which the dominant tenement may be subdivided. Though some increase in burden may result from the fact that the number of users is increased by the subdivision, *the extent of the use is still measured by the needs of the land which constituted the original dominant tenement.*"

*Id.* at 791–92 (quoting RESTATEMENT (FIRST) OF THE LAW OF PROPERTY § 488 (1944) (emphasis supplied)).

■ The bottom line in *Karches* is that the defendant was originally granted an unlimited roadway easement to serve his tract, and he was not prohibited or forbidden from expanding its use due to the subdivision of his land. Here, however, the exclusive easement granted individual Hill–Creek lot owners use of Respondent's private roads. Subdivision of Lot 25, the dominant tenement, was expressly forbidden by Hill–Creek's Protective Covenants, which limit each lot to one residential dwelling to be used for residential purposes only and further provide that "no tract or parcel...shall be divided, subdivided or a part thereof conveyed away." It was never contemplated that the needs of Lot 25 would ever exceed that of a single-family residence with rights for personal ingress and egress, and any additional burden to the Hill–Creek lots, such as that assumed to be contemplated regarding the dominant tenement in *Karches*, was expressly forbidden.

Appellants' proposed use of Respondent's roads "entail[s] more than an increase in the number of vehicles utilizing the drive." *Cheatham*, 593 S.W.2d at 903. It amounts to "[a] change in the quality and nature of the traffic using the drive." *Id.* at 903–04. It went from private use to providing a throughway for a different subdivision. And, in the context of our case, Hill–Creek's Lot 25 is in no way comparable to the dominant tenement owned by the defendant in *Karches*. None of the Appellants in our case ever possessed an unlimited easement so as to allow such an expansion of its use.

Accordingly, we find that the trial court's judgment is supported by substantial evidence and the applicable law. Appellants' two attempts to establish an emergency roadway easement over Lot 25 in Hill–Creek Acres were appropriately nullified. This is dispositive of the case, so we need not address Appellants' other points of error.

We affirm the trial court's judgment nullifying the attempted easements and granting a permanent injunction.

BRECKENRIDGE, P.J., and HOLLIGER, J., concur.